RUBE ROBINSON, complainant,

*v.*

THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, defendant.

[Decided March 25th, 1938.]

*Mr. Herbert J. Kenarik (Mr. Thomas Glynn Walker,* of counsel), for the complainant.

*Messrs. Collins & Corbin,* for the defendant.

EGAN, V. C.

The specific performance of a contract, or policy, of life insurance is sought by the complainant against the defendant. Policy numbered 8502785, in the sum of $10,000, under date of June 25th, 1931, was issued by the defendant upon the life of the complainant. The beneficiary named in the policy is the complainant's wife, Anna Robinson. It contains a provision for total and permanent disability, which reads as follows:

"Upon receipt of due proof as hereinafter provided that the Insured, while said policy and this Disability provision were in force and no premium thereunder in default, became totally disabled or hereinafter defined due to bodily injury or disease before the anniversary of the Register date of said policy upon which the Insured's age at nearest birthday is 60 years and that such Total Disability has existed continuously for at least four months, the Society will, subject to the conditions set forth below, presume such Total Disability to be permanent and

"(a) Waive payment of all premiums upon said policy and all additional premiums for this Disability provision falls due after the commencement of such Total Disability and during its continuance, except that no premium falling due more than one year prior to receipt at the Home Office of the Society of written notice of claim shall be waived; and

"(b) Pay to the Insured for the fourth and each subsequent completed month of such Total Disability during its continuance of a monthly Disability Income of ONE HUNDRED dollars a month, provided, however, that no income shall be payable for any period of Total Disability more than one year prior to receipt at the Home Office of the Society of written notice of claim. The first payment hereunder shall be made upon receipt of such due proof and an additional payment upon the completion of each additional month of such Total Disability during its continuance."

The policy also defines "Disability" as follows:

"Definition. Disability is total when it prevents the Insured from engaging in any occupation for remuneration or profit. The entire and irrecoverable loss of sight of both eyes, or the severance of both hands at or above the wrists, or of both feet at or above the ankles, or such severance of one entire hand and one entire foot, shall be deemed Total Disability hereunder."

During the month of October, 1931, the complainant became ill in New York City and received medical attention. He went to Atlantic City, and while there, collapsed. His doctor ordered him to bed. He remained therein for several days. Upon his return to his home in New York City, he was attended by Dr. Talmadge. The doctor advised a trip to Florida. He went, and remained there about a month, and returned to his home in New York City. He was at home for a period of a month, when he returned to his business, the dress industry. He had been engaged in that business from his early manhood. His age, at the time of the hearing, was forty-one years.

In the month of June, 1932, while proceeding to his place of business, he was taken ill. Returning to his home, he was attended by Dr. Blakeslee, a neurologist, who advised him to return to his work. He did so the following day. He occasionally visited Dr. Blakeslee for treatment until the end of the year 1932. Following the advice of Dr. Blakeslee, he

went to Florida for a rest in January, 1933. He remained there a short while and returned to New York. He was then examined by Dr. Blakeslee, after which he returned to his work. He, in the meantime, had been complaining about a "tightening of, and a very severe pain in the head." Dr. Blakeslee again suggested that he leave town and rest. He then went to the Adirondack Mountains, in New York State, and he remained there for a time. Then becoming "panicky," he returned to New York. He was then again examined by Dr. Blakeslee, who advised him to remain away from business and stay at home and relax. He followed the advice and relaxed until the end of October, 1933. Then, Dr. Blakeslee again examined him and the following day, he was taken to the Aurora Health Farm, Mendham, New Jersey. He remained there, in bed, for four weeks. He then returned to his home in New York City, and was attended by a Dr. Moreno. That was in January, 1934. He was confined to his home for two or three weeks. During that time he had hallucinations about his wife running around with other men; and he wanted "to commit suicide." At the end of three weeks, upon the advice of Dr. Moreno, he was removed to Rye Beach, New York. He remained there for about three months, during which time Dr. Moreno visited him several times a week. During that period, complainant felt that he was "being mistreated," and "was being sent away somewhere," and "refused to eat." He said "they tried to feed me by force. I had lost about sixty pounds. I hadn't had my hair cut in maybe three or four months. I didn't shave, and I didn't bathe. I was used to bathing twice a day, morning and evening showers."

On May 30th, 1934, he left Rye Beach and went to Verona, New Jersey, where he was visited by Dr. Moreno once or twice a week, until the end of December, 1934, when he returned to New York. While at Verona, he took long walks. He returned to New York City in December, 1934. From then on, he took trips to the seashore, and he indulged in fishing, and other forms of recreation. During all the time that he was under the care of Dr. Moreno, he complained

about pains and pressure in his head. During the Easter period of 1935, upon the suggestion of Dr. Moreno, he started to drive an automobile and "found driving great relaxation"—he "completely loosened up."

In June, 1936, he went to Fourth Lake, in the Adirondacks, where he remained twelve or fourteen weeks, when he returned to New York. He testified to his present condition as follows (page 52 testimony).

"*A.* Well, I still have some of the fears left. I still fear that one day I am just going to pass out of the picture. *Q.* And what others, if any? *A.* I hate to say it, because my wife doesn't know it, to tell you the truth, but she thinks I feel a little bit better. But I get terrible, terrible head pains in the head. *Q.* How do they feel? Describe them for us. *A.* It is a sensation as though the head fills up, as though your head is bursting, as though a knife is cutting down through the center of your head right down to your neck. I try to relax to deaden the feeling I get, and it feels as though my head was just going to blow up."

The complainant's firm liquidated during 1933, the time he was at the Aurora Health Farms, Mendham, New Jersey. He alleges that he has not been engaged in any business since August, 1933.

The defendant paid the complainant disability benefits under the policy from December, 1933, to the month of May, 1936, after which it refused to make payments, contending that the complainant was not totally and permanently disabled within the meaning of the provisions of the policy during the months of May and June, 1936; and, also, for the further reason that the complainant had failed to abide by the terms of his contract, in failing to submit due proof of his disability in accordance with the terms of the policy. The provisions of the policy dealing with the manner of submitting proof provide:

"Due proof of such total disability must be received at the Home Office of the Society while said policy and this disability provision are in force or before the expiration of one year after default in payment of premiums, or if there be no default, not later than one year from the maturity of said policy."

The points for determination are: (1) Did the complainant submit to the defendant proof of total and permanent disability as defined in the policy? (2) If such proof was submitted, was it sufficient to establish the right of the complainant to disability? (3) Was the complainant totally and permanently disabled within the meaning of the disability clause of the policy?

The policy, *inter alia*, provided:

"Recovery from Total Disability. The Society shall have the right at any time during the first two years after receipt of such proof of the continuance of such total Disability. If satisfactory proof is not furnished, or if it appears at any time, that such Total Disability has terminated, no further premiums will be waived and no further Disability Income payments will be made on account of such Total Disability."

There is in evidence (*Exhibit D-8*) a letter dated April 21st, 1936, written by the complainant's counsel, Mr. Herbert J. Kenarik, which reads as follows:

"I understand that you have been calling at the Robinson home and have threatened to discontinue the disability payments.

I would like to know on what basis and what justification you have for such threats.

If you desire to interview Mr. Robinson, I would be glad to arrange such an interview at my office. I know of no provision in the policy which requires your policy-holder to subject himself to interviews. If it is an examination you desire, let me know that, too."

That letter was replied to on April 29th, 1936, as follows (*Exhibit D-9*):

"Your letter of April 21st relative to the above claim, has been received.

We wish to advise that any investigations we think necessary will be conducted in this case. We also wish to state that we know of no threats which were made in this case.

In view of your offer to have Mr. Robinson examined, we suggest that you have him call at this office on Tuesday, May 5, between 11 and 12 o'clock for a physical examination.

We regret that our actions in reviewing this claim should have caused any confusion, but we respectfully contend that whatever inspections we care to make are within our province."

Another letter thereafter was written by Mr. Kenarik to the company, dated June 6th, 1936, as follows (*Exhibit D-10*):

"I have not as yet received your check in the sum of $100.00 for my client, Reuben M. Robinson, with reference to the above. Same usually appears on the first of the month.

Will you please give this your very immediate attention."

On June 9th, 1936, the Company wrote to Mr. Kenarik as follows (*Exhibit D-11*):

"We have received your letter dated June 6, relative to the disability claim referred to above.

Upon referring to our file covering this case we note that we wrote to you on April 29, and requested that you have your client call at this office, on May 5, for a medical examination. However, the appointment was not kept, and we do not appear to have been given the courtesy of a reply.

We regret to state that we shall be unable to release further checks in payment of this claim until the requested examination has been made. In this connection we have made another appointment to have the insured examined at this office on Monday, June 15, at 10:45 A. M.

We ask that you kindly have the insured call at this office, Room 507, on the Fifth floor, at the appointed time mentioned above."

On June 15th, 1936, the complainant submitted himself for an examination by the defendant's doctor, Dr. Snyder. Dr. Snyder, in substance, found the complainant in excellent condition mentally and physically. After that examination, or on June 23d, 1936, the defendant wrote to the complainant's counsel, Mr. Kenarik, as follows (*Exhibit D-12*):

"For further information in connection with the above numbered claim we are writing to ask that you kindly inform us of the full name and address of the physician who is attending the above named insured at the present time. We would also like to know just what the insured's complete address will be for the summer.

In addition to the above, the enclosed form should be completed by the insured, notarized and returned to this office.

Your early attention to the above matters will be appreciated."

Mr. Kenarik on June 25th, 1936, replied as follows (*Exhibit D-13*):

"Replying to yours of June 23rd, the physician's name and address you requested is Dr. Jacob L. Moreno, of No. 7 E. 85th Street, New York City.

I do not know what the assured's address will be for the summer since the same has not been determined.

I call your attention to the fact that the payment which was due the first of this month has not as yet been paid and I request that this matter receive your immediate attention."

On July 2d, 1936, Mr. Kenarik also wrote the defendant the following:

"Disability payments in the above matter are now two months in arrears.

Will you please see that checks are forwarded at once."

And on July 10th, 1936, the Company wrote Mr. Kenarik the following:

"We acknowledge receipt of your letter of July 2 regarding our above mentioned insured.

Before we shall be able to release any further checks in connection with this claim, we require evidence of the insured's continued total disability. We shall appreciate it, therefore, if you will have the enclosed form No. 2 completed by Dr. Moreno whom we understand is treating the insured at the present time.

Prompt attention will be given to the matter upon receipt of this requirement."

The defendant claims that it never received any execution of the disability claim mentioned in its letter of July 10th, 1936, to the complainant. However, it appears that one of the defendant's inspectors visited Dr. Moreno, and received a report from him as to the complainant's condition.

I believe that the examination to which the complainant submitted himself by the defendant's doctor in June, 1936, and the report which Dr. Moreno made to the defendant's inspector complied with the provisions of the policy. It is in accord with the principles expressed in the case cited by the defendant of Goldman v. New York Life Insurance Co., 115 N. J. Eq. 535; 171 Atl. Rep. 541.

There is testimony that the defendant's agents closely watched the actions of the complainant. It, in substance

is—that the complainant during the time he claimed to be disabled, was very active; that he walked many miles daily; that he drove and operated an automobile in congested streets and areas in the city of New York, and in the State of New Jersey; and that in the course of his driving, he visited properties in Hudson county, and in the city of Newark, New Jersey, where his wife had real estate interests; that on those visits he was accompanied by his wife's partner in her realty holdings. The effect of such testimony, the defendant argued, indicates that the complainant, during the claimed disability period, was engaged in business for, and in behalf of, his wife.

The evidence also shows that the complainant while at Fourth Lake, played golf, walked and went fishing, and was engaged in normal activities.

It further appears that in May, 1933, the complainant applied to the defendant for an additional $25,000 worth of insurance. In his application for it, he stated that he had never been treated for any disease or disturbance to the brain or the nerves; never had any vertigo, or dizzy spells; and that he was never treated for any disease or disturbance of the heart or blood vessels. His application for a license to drive his automobile for 1934 and 1935, which was sworn to by the complainant, answered "No" to the question "Have you suffered from any physical or mental disease, or been confined to a state institution, state hospital, or private institution since April 15th, 1933? The same answer "No" was made to a similar question in an application for a driver's license for the years 1936 and 1937. When Dr. Moreno examined the complainant in December, 1933, he says he found that the complainant was suspicious of his wife; felt his food was being poisoned; that his stomach was sore and that he had pains "everywhere;" and he felt that nobody could give him relief. He presented a picture that was highly hypocondria, since his examination showed nothing. The doctor said complainant's heart and stomach were all right; and there was no reason to conclude he had any physical disease. He diagnosed complainant's case as manic depressive

psychosis. The doctor's opinion was that if the complainant re-engaged in the dressmaking business, it would be detrimental to his physical condition, and cause a recurrence of his complaint. He, also, testified that he examined the complainant two months prior to the date of the hearing, and found him not fully recovered from his condition. He believed that the complainant had improved under his care. He found nothing wrong with him except when he had hallucinations. He testified the complainant could ride on the subways, operate an automobile, and do other things which would occupy his mind; that he could examine buildings to see if they needed repairs; make deposits in a bank; and that "it would be good for him to be out and around." Upon being asked whether "a man could cut cloth from a pattern in a shop where he did not see any customers," he said he could not answer the question. The doctor felt that the complainant should be engaged in an occupation for his benefit; but he did not feel that if he earned money in this occupation, it would be good for his condition.

Dr. Blakeslee testified that when he examined the complainant on June 2d, 1932, he then complained of numbness in his body; that his nerves were on edge; that he walked in a daze; that he had heat waves in the stomach; that his hands were shaky; that his legs were unsteady; that he had no pep; that he lost weight; that he slept poorly; and that he had a throbbing of the head. The doctor diagnosed the case as "anxiety depression." On December 9th, 1936, he again examined the complainant, and he learned from him that he had not worked since August, 1935; that he had been under treatment by Dr. Moreno. He said that the complainant was less emotional, although he had a poor day occasionally; that he did not have the "panicky" experiences as when he last had seen him; that his memory was good for recent and past events; and that he claimed then to have no enemies. A neurological examination showed the complainant's gait to be normal; Rhomberg sinus was negative; co-ordinated tests normal; no ocular palsies; no nystagus; the fundus were normal; deep reflexes were hyperactive and

superficial reflexes were active and equal; the hearing was normal and a Weber sign was not revealed to the left or right; the other cranial nerves were normal; the general sensory examination was normal; he weighed one hundred and ninety-four pounds; his blood pressure was one hundred and fifty to one hundred. The doctor's opinion was the complainant was very much better and very much increased in health. Dr. Blakeslee said that as of December, 1936, the complainant's condition would not permit him to engage in business because he was suffering from a mental disease, which caused him to lose power of proper concentration, become emotional and lose sleep; that it caused him to have ideas that he was suffering from a physical disease of the heart, and he became very depressed. However, he stated that there was nothing wrong objectively with the complainant, and he felt that he would make a complete recovery because his experience showed that cases of manic depressive psychosis always did recover; that the complainant was well co-ordinated, mentally alert and anxious to return to work. The doctor further said he did not believe it would hurt Robinson to manage an apartment house, as he was quite able to do that (pages 236, 237 testimony). He further testified as follows:

"Q. If he had done the things which you have already said, they wouldn't hurt him? A. No. Q. Then he isn't totally disabled from performing any business? A. No, I don't think so. Q. And when you saw him in December, 1936, he wasn't in such a condition as would prevent him from engaging in any occupation for remuneration or profit, was he? A. Why, I don't know what he is doing. I haven't the slightest idea. Q. I am not asking you that, doctor. As of December, 1936, if I remember your testimony correctly, you would not say he was prevented, as you saw him then, from engaging in any occupation for remuneration or profit? A. I think that's true. Q. Do I understand, doctor, from what you saw from the condition you found him in in December, 1936, that in your opinion he ought to continued to improve? A. Yes, I think so. (Pages 237, 238 testimony.)

On behalf of the defendant, Dr. Denker, a specialist in nervous and mental diseases, said he examined the complainant in September, 1934, and was present at an examination in the office of Dr. Dowd at Newark on October 27th, 1936. Dr. Denker says he found the complainant, after a complete neurological and psychiatrical examination, a well developed man. The doctor further testified that the examination of October 6th, 1936, showed the complainant's condition was normal from a neurological and psychiatrical standpoint; that there was no organic or mental impairment of any kind; in his opinion the complainant could engage in business for remuneration or profit.

Dr. Snyder examined the complainant on June 15th, 1936. He testified on behalf of the defendant, and stated that he found the complainant in excellent physical condition. Dr. Beling, a specialist in nervous and mental diseases, examined the complainant on October 16th, 1936, in the office of Dr. Dowd in the city of Newark. His examination showed an apparently strong, well nourished, individual; eye grounds, pupils and ocular movements normal. There were no tremors present. His tonsils were infected and inflamed, and the throat somewhat congested. There were no pathological reflexes of any kind (page 344 testimony). From a mental standpoint he was well orientated. He knew where he was, knew the time of the day, knew the people around him. He was coherent and relevant in his conversation and did not exhibit any effects of hallucinations or delusions or illusions. He did not exhibit any evidence of mental unsoundness. He was rather nervous and somewhat unstable emotionally. He was of the opinion that two teeth which were capped and infected made him nervous and when eradicated he would get better (page 345). His heart was normal (page 346). The doctor said that infections which are deep in the tonsils, are always cause of nervousness, and, when eradicated, these symptoms disappear. There was nothing in his mental condition which would prevent him from carrying out his occupation (page 349). He could engage in the dressmaking business which consisted of cutting of cloth for women's dresses,

making of patterns, supervision and management of employes, as well as the sale of dresses. He had no physical disability, mental or otherwise, which prevented him from dealing in real estate, from looking at apartment houses, collecting rents or supervising repairs (page 350). At the time he examined him he had no disability whatsoever that would prevent him from engaging in any occupation for remuneration or profit (pages 350, 351).

Dr. Lawrence M. Collins, a specialist in mental diseases, from Greystone Park, Morris Plains, New Jersey, testified that he examined the complainant on January 16th, 1937, and found him quite orderly, agreeable and co-operative throughout the examination, and presented no physical stigmata or degeneration of any kind. He answered questions promptly and relevantly (pages 371). He was negative for nervous or mental disease, and could find no reason why he could not return to work in the dressmaking business (pages 372, 376). There was no reason why he could not walk along the busy streets in New York, nor ride in a subway, nor drive an automobile. He could carry on such activities as buying and selling real estate, looking at apartment houses, and collecting rents, supervising such apartment houses, dealing with bank officials in financial matters and having conferences with lawyers (page 377). At the time he examined the complainant, he had no disability which would prevent him from engaging in any occupation for remuneration or profit (page 378).

The solicitor for the complainant arranged for the defendant's doctors to examine the complainant in the Newark office of Dr. Ambrose F. Dowd, a neurologist. Dr. Dowd's examination was made in the presence of Drs. Beling and Denker. However, Dr. Dowd was not called by the complainant to testify. That seems significant.

All the doctors, who testified in behalf of the defendant, stated that the complainant was not suffering from any mental or physical disability, and in their opinions, was able to perform many duties in the dress business and engage in a variety of work for remuneration or profit.

I have recited at great length the testimony submitted on behalf of the complainant's contention, and, to a similar extent, the defendant's evidence disputing the complainant's claims, because of the conflicting evidence. The situation herein is purely factual.

The complainant's attitude has not created an impression favorable to him. His credibility has been seriously impaired. His application for $25,000 additional insurance, wherein he denied that he had been suffering from physical or mental ill health, and his answers to his application for automobile licenses for the years 1934, 1935, 1936 and 1937, wherein he stated he was suffering no physical or mental ill health, all of which was at variance with his testimony in this proceeding, lead me to the conclusion that his testimony lacks sincerity and is questionable and doubtful. Where in his story of his ills and conduct, can the line between what is true and what is false, be drawn? His statements to his attending physicians were evidently accepted by them for their face value. Their conclusions as to his mental condition were undoubtedly to a large extent formed from the information he furnished them. I cannot resist the inference that a large part of the information as to his alleged illness which the complainant gave to his doctors, was exaggerated, and submitted by him to them for the purpose of enlisting their support of his claim for benefits under the policy. The testimony shows that the complainant had little, or no, objective symptoms. As above observed, every doctor of the defendant testified that the complainant was normally sound, while his own doctors declared that his condition was improved.

I am not impressed with the contention of the complainant's doctors that he cannot engage in his former business of dressmaking: that of cutting cloth for women's dresses, making patterns for the same; supervision and management of employes engaged in that business, as well as the sale of dresses. Such activities, I am satisfied, are no more onerous, and no more of a strain upon one's physical or mental weakness, than the activities which the evidence shows the complainant engaged in during the periods of his alleged illness.

His daily activities indicated the expenditure of considerable energy; and his business and social movements were varied and unquestionably natural and conformed entirely with the established norm.

The complainant, without doubt, has been ill; and the defendant has compensated him for the period of his illness; but I feel that it—the defendant—was justified in its refusal to make further payments under the policy, because of want of proof of total and permanent disability. I am satisfied that the complainant is not permanently disabled within the meaning of the disability clause in the policy.

Under the circumstances, I shall advise an order to conform with the views herein expressed.